**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

    Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| LESTER WRECKSIE, <br><br>Plaintiff, <br><br>v. <br><br>MULTNOMAH COUNTY, CITY OF PORTLAND, JOHN DOES 1-12, <br><br>Defendants. | Case No. <br><br><br>COMPLAINT <br><br>Civil Rights Action (42 U.S.C. § 1983) <br><br>JURY TRIAL DEMANDED |

    This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiff Wrecksie and tens of thousands of his fellow community members, and millions of other people around the world, have taken to the streets to protest white supremacy and police violence in the United States generally and in Portland specifically. Defendants Multnomah County, by and through its agents, Multnomah County Sheriff's Office ("MCSO"), and City of Portland, by and through its agents, Portland Police Bureau ("PPB"), acted in concert to respond with unlawful and indiscriminate violence against demonstrators outside of the Multnomah County Justice Center ("Justice Center"), which also houses the Multnomah County Detention Center ("MCDC"), in

the law enforcement agencies' continued effort to silence speech. Because of this pattern and practice and the intentional conduct of a PPB officer or MCSO deputy, Plaintiff was injured by a stun or flashbang grenade and, while he was disoriented from the grenade, officers took his bicycle from him, threw it over the fence surrounding the Justice Center, and provided no means for him to retrieve it. Plaintiff is entitled to damages, and an award of attorneys' fees and costs.

## JURISDICTION

1. This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4).

## VENUE

2. Venue is proper within the District of Oregon because a substantial part of the events giving rise to this claim occurred in this judicial district, and all parties reside in this judicial district. 28 U.S.C. § 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County, Oregon.

## PARTIES

3. Lester Wrecksie, Plaintiff, at the time of filing and all material times, was a citizen of the State of Oregon.

4. Defendant Multnomah County ("County") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The County runs the Multnomah County Sheriff's Office ("MCSO"). On information and belief, each and every decision to unlawfully use "less lethal" weapons against Plaintiff and to unlawfully confiscate Plaintiff's property was made

and/or ratified by a sufficiently high level as to be policy decision of Multnomah County. On information and belief, the MCSO deputies who used "less lethal" weapons against Plaintiff and seized his property were acting pursuant to the practice or policy of Multnomah County in coordination and concert with Defendant City of Portland.

5. Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau (hereinafter, "PPB"). On information and belief, each and every decision to unlawfully use "less lethal" weapons against Plaintiff and to unlawfully confiscate Plaintiff's property was made and/or ratified by a sufficiently high level as to be policy decision of the City. On information and belief, the PPB members who used "less lethal" weapons against Plaintiff and seized his property were acting pursuant to the practice or policy of the City in coordination and concert with Defendant Multnomah County.

6. Plaintiff does not know the name of Defendant John Doe 1, and thus sues them under a fictitious name. John Doe 1 is a law enforcement officer who, under color of law and coordination between Defendants, threw a stun grenade at Plaintiff, injuring him, and took Plaintiff's bicycle and threw it over the fence of the Justice Center after another one to three officers had taken Plaintiff's bicycle away from Plaintiff and thrown it away from Plaintiff. John Doe 1 is sued in their individual capacity.

7. Plaintiff does not know the name of Defendant John Does 2-4, and thus sues them under a fictitious name. John Does 2-4 are law enforcement officers who, under color of law and coordination between Defendants, took Plaintiff's bicycle while he was disoriented after being injured by a stun grenade and threw it multiple times away from Plaintiff. Defendants Does 2-4 also include officers who hit Plaintiff with batons. They are sued in their individual capacity.

8. Plaintiff does not know the names of Defendants John Does 5-12, and thus sues them under fictitious names. John Does 5-12 are any City and/or County employees who exercised command responsibility over, conspired with, aided and abetted subordinates, and/or directly or indirectly participated in Plaintiff's deprivation of civil rights as hereinafter alleged, or furthered the pattern and practice of unconstitutional conduct hereinafter alleged. They are sued in their individual capacities.

**FACTUAL ALLEGATIONS**

**I. History of Illegal Pattern and Practice**

9. On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

10. For many Americans, and particularly for Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

11. Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show that the police in this

COMPLAINT
Page 4 of 15

country are out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, kettling whole groups of protestors only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protestors, shooting kinetic impact munitions into crowds of people who are doing nothing but protesting peacefully, and using massive amounts of tear gas in a systemic effort to stop people from protesting police violence. These violent police responses have only reinforced the need for the call for change demanded by protesters.

12. By May 29, 2020, Portlanders had begun demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. MCSO and PPB, like law enforcement agencies throughout the country, met those demands with violence against protesters.

13. A focal point of conflict between MCSO, PPB, and protesters has been the Multnomah County Justice Center, in downtown Portland, which was, for many weeks, surrounded by fencing. The building houses PPB's central precinct, MCDC operated by MCSO where hundreds of humans—disproportionately Black—are housed in small cage-like cells, and a small number of courtrooms where the business of the criminal legal system perpetuating these racial inequalities continues every working day. It is, in short, a perfect symbol of the harms the protestors have sought to address.

14. MCSO and PPB were determined to keep the protesters away from the Justice Center by closing public streets, erecting fences, and guarding it with lines of law enforcement officers wearing armor, helmets, and gas masks who were stocked with and using weapons against the protesters. Many nights of protests around the Justice Center culminated in law enforcement from the City and County using a variety of weapons against the protesters, including

indiscriminately spraying demonstrators with tear gas, plastic bullets, rubber bullets, pepper balls, blast balls, stun grenades or flash bangs with and without projectiles, and other "less lethal" weapons, while launching aerial munitions into the air above the protesters' heads.

15. After the District Court for the District of Oregon entered a Temporary Restraining Order on June 9, 2020, in the case *Don't Shoot Portland, et. al. v. City of Portland, et. al.*, USDC of Or. Case No. 3:20-cv-00917-HZ, limiting PPB's use of tear gas on protestors, upon information and belief MCSO and PPB escalated their use of rubber bullets, pepper balls, blast balls, stun grenades or flash bangs, and other impact munitions on police accountability protesters in an indiscriminate and otherwise unlawful manner.

16. Upon information and belief, Defendants City of Portland and Multnomah County have engaged in a mutual aid compact or other similar agreement that coordinates MCSO and PPB law enforcement actions to act in concert to clear to individuals participating in protest events from the area around the Justice Center.

**II. Allegations from June 20, 2020**

17. Lester Wrecksie attended the protests in Downtown Portland throughout the Spring and Summer of 2020, because Black Lives Matter and because he wants to make his community safer and more equitable.

18. On or about the night of June 20, 2020, Mr. Wrecksie was protesting in the area around the Justice Center where hundreds of people were gathered to protest police violence against the community. Defendants announced that the Downtown area was closed. Mr. Wrecksie and other protesters began moving in the direction they were ordered by Defendants. He was walking with his carbon-fiber bicycle that he had had for about 15 years, which was his primary means of transportation and held significant sentimental value, on SW 3rd Ave. near SW Main when

Defendants approached him from the South on SW 3rd Ave. and from the East on SW Main. Plaintiff was merely walking with his bicycle and did nothing to attempt to resist the dispersal order of Defendants and did nothing to put any officer's safety at risk in any way.

19. As discussed above, the County and/or the City of Portland had erected fencing around the Justice Center. The fence itself became a focal point for protest activities, as it emblemized the lack of access to the Courts and to justice for the public. The fences around the Justice Center were erected in many positions around that time, but around June 20, 2020, the fence was either on the sidewalk along SW 3rd Ave in front of the Justice Center or just beyond the sidewalk and on the street.

20. As Defendants approached the protesters from the South, Mr. Wrecksie was slowly walking away from them, as directed. Defendant John Doe 1 was at least ten yards from Plaintiff when he tossed a stun grenade at Plaintiff, which exploded under Plaintiff's foot. The explosion caused Plaintiff to fall to the ground and caused Plaintiff pain, disorientation, and possibly unconsciousness. The explosion and/or the fall caused injury to Plaintiff's head, despite the fact that he was wearing a bicycle helmet, causing him to be disoriented and have symptoms of a concussion. The stun grenade is believed to have also contained projectiles that caused multiple small, round welts and bruises to Plaintiff's legs.

21. Immediately after the explosion, while Plaintiff was disoriented, Defendants took his bicycle and threw it away from Plaintiff. Plaintiff was then subjected to being hit with batons.

22. Upon information and belief, based on video from the incident, multiple Defendants immediately seized and threw Plaintiff's bicycle far away from him multiple times until Defendant John Doe 1 then took it and threw it over the fence surrounding the Justice Center.

23.     Defendants then hit Plaintiff with batons as other protestors and protest medics helped Plaintiff off the ground and helped him move away from the officers. At no time did the officers attempt to detain Plaintiff or otherwise attempt to arrest him.

24.     Once Plaintiff had left the area that Defendants were dispersing protesters from, he attempted to find his bicycle by approaching the Justice Center from multiple sides but was prevented from returning and was forced away from the area. He also attempted to locate his bicycle by calling law enforcement property holding facilities and was told that they did not have his bicycle.

25.     Defendants County and City have repeatedly permitted, directed, or ratified the frequent and common act of officers' seizure of property of protesters without any legal justification and in violation of their rights.

26.     Plaintiff suffered from concussion symptoms for at least a week after Defendants harmed him. He also had welts and bruises on his legs. Plaintiff was, despite his attempts, unable to ever get his bicycle back.

27.     Plaintiff was physically harmed and frightened by Defendants' use of weapons against him.

28.     As a result of the above, he feels fearful of police.

**Claim 1: Fourth Amendment – Excessive Force/Unlawful Seizure – Individual Liability**
**(42 U.S.C. § 1983)**

29.     Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

30.     It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

COMPLAINT
Page 8 of 15

23.     Defendants then hit Plaintiff with batons as other protestors and protest medics helped Plaintiff off the ground and helped him move away from the officers. At no time did the officers attempt to detain Plaintiff or otherwise attempt to arrest him.

24.     Once Plaintiff had left the area that Defendants were dispersing protesters from, he attempted to find his bicycle by approaching the Justice Center from multiple sides but was prevented from returning and was forced away from the area. He also attempted to locate his bicycle by calling law enforcement property holding facilities and was told that they did not have his bicycle.

25.     Defendants County and City have repeatedly permitted, directed, or ratified the frequent and common act of officers' seizure of property of protesters without any legal justification and in violation of their rights.

26.     Plaintiff suffered from concussion symptoms for at least a week after Defendants harmed him. He also had welts and bruises on his legs. Plaintiff was, despite his attempts, unable to ever get his bicycle back.

27.     Plaintiff was physically harmed and frightened by Defendants' use of weapons against him.

28.     As a result of the above, he feels fearful of police.

**Claim 1: Fourth Amendment – Excessive Force/Unlawful Seizure – Individual Liability**
**(42 U.S.C. § 1983)**

29.     Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

30.     It is clearly established law that an officer may not use force that, in light of the circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

31.     In taking the actions described above, including but not limited to causing a stun grenade to explode under Plaintiff—a person who was unarmed, passively protesting, and following dispersal orders—Defendant John Doe 1 intentionally violated Plaintiff's right to be free from unlawful and unreasonable seizures guaranteed by the Fourth Amendment to the United States Constitution.

32.     Defendant John Doe 1 violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to John Doe 1 could have believed that their conduct was lawful or within the bounds of reasonable discretion. Defendant John Doe 1 therefore does not have qualified or statutory immunity from suit or liability.

33.     The actions of Defendant John Doe 1, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendant John Doe 1, in their individual capacity, in an amount sufficient to punish them and to deter others from like conduct.

34.     John Does 5-12 participated in Plaintiff's injury by failing to train, supervise, and discipline John Doe 1, and/or by directing John Doe 1 to use stun grenades upon Plaintiff. Their direct participation in the injury caused Plaintiff's rights to be violated.

35.     The unreasonable seizure and excessive force used on Plaintiff by Defendants was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

///

///

COMPLAINT
Page 9 of 15

## Claim 2: Fourth Amendment – Unreasonable Seizure of Property

## (42 U.S.C. § 1983)

36. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

37. Defendants John Does 1-4 intentionally and unreasonably seized Plaintiff's bicycle, ripping it away from him while he was disoriented such that he did not know what happened to his bicycle, and threw it over a fence inside of which Plaintiff had no access, depriving him of his rights to his property under the Fourth Amendment.

38. The seizure was done without warrant, Plaintiff was not arrested, and the seizure was not done pursuant to any warrant exception.

39. The actions of Defendants John Does 1-4, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendants, in their individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

40. John Does 5-12 participated in Plaintiff's injury by failing to train, supervise, and discipline John Does 1-4, and/or by directing John Does 1-4 to unlawfully seize property from protesters. Their direct participation in the injury caused Plaintiff's rights to be violated.

41. Defendants County and City are liable for under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

42. The unreasonable seizure of Plaintiff's bicycle by Defendants permanently deprived him of his property and caused him emotional harm. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

///

## Claim 3: Fourteenth Amendment – Due Process

### (42 U.S.C. § 1983)

43. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

44. Defendants John Does 1-4 intentionally and unlawfully seized Plaintiff's bicycle and provided him with no information or way to get it back.

45. Plaintiff was disoriented and dazed from the stun grenade and did not know where Defendants took his bicycle. Defendants provided him with no information about where his bicycle was taken, why it was taken, how to retrieve it, or how to challenge the seizure, depriving him of his property without the due process required by the Constitution, violating his rights.

46. The actions of Defendants John Does 1-4, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendants, in their individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

47. Defendants in a supervisory capacity are held liable for violations due to their own culpable action or inaction either through (a) their own direct participation in the violations; (b) their failure to train, supervise or control subordinates; (c) their own acquiescence in the constitutional deprivations; (d) their failure to remedy a wrong after learning of the violation; (e) creating a custom, practice or policy that leads subordinate staff to commit constitutional violations or allowing such custom, practice or policy to continue; or (f) other conduct which shows a reckless or callous indifference to the constitutional rights of others.

48. Upon information and belief, Supervisory Defendants authorized and/or acquiesced to the conduct alleged herein which caused Plaintiff's constitutional deprivation.

49. Defendants County and City are liable for under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

50. As a direct and proximate result of Defendants' unconstitutional acts, Plaintiff suffered the permanent deprivation of his property and associated mental harms, outrage, betrayal, offense, indignity, and insult causing damage in amounts to be determined at trial.

**Claim 4: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability**

**(42 U.S.C. § 1983)**

51. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

52. Multnomah County and City of Portland acted in concert to clear protests from around the Justice Center. Both Defendants have official policies allowing the use of "riot control" and "less lethal" weapons against a crowd. These policies do not properly follow the *Graham v. Connor* Fourth Amendment standard regulating the use of force against individuals. The policies allow for the unlawful and indiscriminate use of force against a crowd of people, including those engaging in passive resistance, in violation of the Fourth Amendment.

53. Alternatively, even if the policies themselves are constitutional, PPB and MCSO's actual practice and custom is to allow the use of "riot control" and "less lethal" weapons in unlawful manners against a crowd both before and after an "unlawful assembly" and/or a "civil disturbance" has been declared, even when a substantial number of people in that crowd, or even the great majority of that crowd, are obeying law enforcement orders, engaged in no resistance, or engaged in only passive resistance to an order. Defendants' training has not sufficiently

protected against and prevented unlawful uses of force such as those used against Plaintiff. In fact, at least one training within the few years before Plaintiff was harmed advocated for police to harm protesters and trained officers on incorrect law that allowed for officers to use force against passive protesters.

54. The City and the County have tacitly and explicitly authorized the use of indiscriminate crowd control weapons on crowds of protestors by justifying or condoning uses of similar tactics, including "less lethal" weapons used unlawfully and indiscriminately on crowds of protestors, at protests on these dates. The City and the County knew or reasonably should have known this would lead to the constitutional violations alleged herein.

55. Defendants, acting pursuant to this policy, custom, or practice, unlawfully used "less lethal" weapons against Plaintiff as alleged above, causing his injuries. The unreasonable seizure and excessive force of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, anguish. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 5: First Amendment – Unlawful Pattern and Practice – Municipal Liability**

56. Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

57. Plaintiff was engaged in constitutionally protected acts of free speech, including public demonstration opposing racism and police violence against Black people. Plaintiff will continue to do so in the future.

58. The First Amendment protects persons from unlawful curtailment of expressive conduct, assembly, and associations with one another.

59. Defendant John Does 1-12's retaliatory motive was the but-for cause of Plaintiff's injuries. By using a stun grenade and batons against Plaintiff and by unlawfully seizing his bicycle, Defendants injured Plaintiff while and because he protested police violence, and Defendants chilled Plaintiff's political speech, violating his First Amendment rights.

60. Defendants' use of force against Plaintiff for engaging in First Amendment protected activity, and their unlawful seizure of his property, to deter future similar protest activity, evidences a pattern and practice of unconstitutional conduct.

61. Defendants have a custom and practice of using militarized force against anti-police protestors, as demonstrated by the use of tear gas and "less lethal" weapons against those protesting outside the Justice Center, a significant symbolic representation of the issues being protested. The Defendants' use of force and unlawful seizure of property was intended to unlawfully punish protestors individually and *en masse* for their political speech and to deter further similar expressions of speech. The supervisory decision to use "less lethal" weapons indiscriminately or otherwise unlawfully and unconstitutionally on a crowd of protestors demonstrating outside the Justice Center was made in retaliation for the protestors' protected speech condemning the police at the symbolic embodiment of the protest subject matter and to chill the expression of further similar speech. So too was their custom, practice, or policy to seize property of protesters without legal justification.

62. The above-described conduct was a proximate cause of harm to Plaintiff. The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

///

## REASONABLE ATTORNEY'S FEES AND COSTS

63. 42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

64. Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. For economic, non-economic, and punitive damages in an amount to be determined at trial;

B. For reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988; and

C. Such other relief as the court deems just and proper.

DATE: June 17, 2022.

*/s/ Franz Bruggemeier*
Franz Bruggemeier, OSB #163533
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*